# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

UNITED STATES OF AMERICA        CIVIL ACTION NO. 07-20069

VS.        JUDGE MELANÇON

HUGH SEBRON GRICE        MAGISTRATE JUDGE METHVIN

*FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS*
*(Rec. Doc. 35)*

Before the court is the motion to suppress filed by defendant Hugh Sebron Grice on December 14, 2007.[1] An evidentiary hearing was held before the undersigned Magistrate Judge on February 21, 2008. At the conclusion of the hearing, I orally stated my findings and conclusions, and recommended that the motion be denied, reserving the right to supplement the findings and conclusions in the event objections were filed. (Rec. Doc. 55). Grice filed a notice of objections, and therefore this formal report is being issued.

## *Background*

Defendant is charged in a ten-count indictment with various drug and firearm offenses, including manufacture of methamphetamines. The indictment resulted from a joint investigation by the Beauregard Parish Sheriff's Office (BPSO), the DeRidder Police Department, the Louisiana State Police (LSP), the United States Marshals Service (USMS), the Drug Enforcement Administration (DEA) and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

On March 20, 2007, based on information gained through the United States Marshals Joint Task Force and the BPSO, Officers Craig Richard and Dale Sharp of the Beauregard-

---

[1] Rec. Doc. 35.

DeRidder Narcotics Task Force lead a SWAT operation to arrest Grice at his residence. The officers were armed with two bench warrants for Grice's failure to appear in Calcasieu Parish (14th JDC) on charges of second-degree battery and methamphetamine trafficking.[2] A group of state officers convened at Grice's home in DeQuincy, Louisiana, including Officers Richard and Sharp and their two SWAT teams. Air support was provided by the Louisiana Forestry Service in the event that Grice ran from the residence.[3] A bomb specialist with the Louisiana State Police was on call.

On March 21, 2007, the day following Grice's arrest, officers conducted a search of Grice's home. In addition to the state officers, an ATF Task Force Officer from Lake Charles, Louisiana, Sgt. Ray Laviolet, was present as well as Deputy U. S. Marshal Beau Bartel.[4] The evidence seized included shotguns, assault rifles, pistols, ammunition, grenades, silencers,

---

[2] Deputy Sharp, a member of the U.S. Marshal's Joint Fugitive Task Force, testified at the evidentiary hearing that he had bench warrants for Grice's failure to appear on second degree battery and methamphetamine drug charges out of Calcasieu Parish. (Tr. 31). Two bench warrants (apparently duplicates) were issued on the same date, March 12, 2004, for failure to appear in connection with a second-degree battery charge and were introduced into evidence at the hearing. *See* G2, G3. The bench warrant for Grice's failure to appear on the drug trafficking charges, however, was not introduced into evidence. When G2 and G3 were introduced, Deputy Sharp confirmed (apparently in error as to the drug charges) that they were copies of warrants that DUSM Bartel had provided and were copies of bench warrants issued by the 14th Judicial District, Calcasieu Parish for second degree battery and for multiple drug charges, including methamphetamine trafficking. The government indicates in its brief that DUSM Bartel, also a member of the U.S. Marshals Joint Fugitive Task Force, contacted Deputy Sharp on March 20, 2007, and told him that he had arrest warrants for Grice out of Calcasieu Parish: one warrant was issued in March, 2004, for failure to appear on a second degree battery charge, and a second warrant, issued in April, 2004, charged Grice with failure to appear on charges of possession of cocaine, possession of methamphetamine with intent to distribute, obstruction of justice, and illegal carrying of weapons (Government's Memorandum, Rec. Doc. 41, p. 3-4).

[3] Narrative report of Deputy Dale Sharp, admitted as Court Exhibit 1at the hearing, (hereinafter C-1), p. 122.

[4] Sharp Narrative, C-1, p. 122.

explosives, chemicals, glassware, four improvised bombs, a marijuana plant, and a marijuana grinder containing marijuana.[5]   The chemicals were turned over to the DEA for testing.[6]

The instant indictment charges Grice with manufacture and attempted manufacture of methamphetamine; possession of methamphetamine and marijuana with intent to distribute, possession of drug manufacturing paraphernalia, possession of bombs, machine guns, and other firearms during and in furtherance of drug trafficking crimes; possession of firearms by a convicted felon, and possession of certain firearms (including machine guns, bombs and silencers) that were not registered by the National Firearms Act (NFA).[7]

### *Issues Presented*

Grice raises the following issues in his motion to suppress: 1) the SWAT team's warrantless entry into his residence at the time of his arrest was unlawful; and 2) Grice's consent to the search was not knowing and voluntary, and did not purge the taint of the constitutional violation.[8]

### *Evidentiary Hearing*

Six witnesses testified at the evidentiary hearing:

---

[5] Sharp Narrative, C-1, pp. 122-123.

[6] Id., p. 128.

[7] Rec. Doc. 1.

[8] With respect to standing, it is noted that Grice originally argued in his motion that the government had no authority to enter the cabin which was the home of a third party. The government responded by challenging his standing to bring the instant motion. The proponent of a motion to suppress has the burden of showing that he has standing. United States v. Wilson, 36 F.3d 1298, 1303 (5th Cir.1994). To have standing, Grice must show that he had a reasonable expectation of privacy in the area or item searched. U.S. v. Osunegbu, 822 F.2d 472, 478 (5th Cir. 1987) (citations omitted). This argument was not urged at the evidentiary hearing. Grice, however, testified that he had been living in the house on and off for three years. (Tr. 146). Accordingly, the undersigned finds that Grice has standing to bring the instant motion to suppress.

1.  Dale Sharp, Beauregard-DeRidder Narcotics Task Force;
2.  Robert McCullough, Chief Deputy, Beauregard Parish Sheriff's Office;
3.  Jarol Morrow, Merryville Patrol Officer;
4.  Ray Laviolet, Sgt., Lake Charles City Police Department;
5.  Craig Richard, Beauregard-DeRidder Narcotics Task Force; and
6.  Defendant Hugh Sebron Grice.

Each witness will be addressed in turn.

**Dale Sharp** is a deputy sheriff with the BPSO and a member of the Beauregard-DeRidder Narcotics Task Force. Deputy Sharp testified as follows:

He is a DEA-certified investigator of methamphetamine labs, and has been trained as a SWAT team supervisor in drug investigations. He is also a commissioned agent with the U.S. Marshal's Office as a task force member.[9] Following the instant investigation, he prepared a lengthy and detailed Narrative Report which was admitted into the record at the hearing as Court Exhibit 1. The narrative states that on February 14, 2007, he learned from BPSO Deputy Robert Butler that there were outstanding bench warrants for Grice concerning second-degree battery and methamphetamine drug charges.[10] Deputy Butler advised Deputy Sharp that he and BPSO Deputy V. J. Franks had received information that defendant was living at 708 Gearden Rd., DeQuincy, and that they had visited the residence the previous afternoon.[11] The officers reported finding security cameras on the house, a plastic melted mini-blind, and numerous tanks behind

---

[9] Tr. 17, 63.

[10] Sharp Narrative, C-1, at p. 121; Tr. 17, 64-65.

[11] *Id.* Deputy Sharp testified that people who "cook" methamphetamine use tanks to store anhydrous ammonia which also could be used for making explosives.(Tr. 62.

the residence.[12]  They felt that Grice was "cooking methamphetamine" and left without making

contact because they felt unsafe.[13]

Deputy Sharp decided to run a SWAT operation and organized it for March 20, 2007.[14]

That day, he spoke by telephone to Deputy U. S. Marshal Beau Bartel, who advised that the USM

Joint Fugitive Task Force had warrants for Grice and information that Grice possibly had

weapons, some type of bomb-making items, and possible ties to the Ku Klux Klan.  On

March 20, Deputy Sharp, together with Lt. Craig Richard, also with the Beauregard-DeRidder

NTF and a trained SWAT leader, organized two SWAT teams, a "recon" team, and an "entry"

team for that night's operation.  Deputy Sharp also arranged for a bomb specialist, Louisiana

State Trooper Shelly Hopkins, to attend the SWAT briefing held that night prior to the arrest.

At approximately 8:00 p.m. on March 20, 2007, Deputy Sharp completed the SWAT

briefing; the recon team left for Grice's Dequincy residence. At the same time, DUSM Bartel

went to Lake Charles to check on a residence where Grice might be found.  Trooper Hopkins

advised he would be on call if bombs were found.  Officers Sharp and Richard left with the

SWAT entry team "to get close to residence in case the recon team needed . . . assistance."[15]

At 9:15 p.m., the recon team leader, Deputy Gary "Bud" Crow, advised Deputy Sharp

that they had arrived.  Deputy Crow believed that the team had been compromised due to the

surveillance cameras:  when they neared the cabin, the lights went out, the TV was turned off,

---

[12] Id.

[13] Id.

[14]  Sharp Narrative, C-1, at pp. 121-122, Tr.  29-33.

[15]  Sharp Narrative, C-1, at p. 122.

and they heard someone lock the front door.[16]  Deputy Crow also advised that marijuana plants

were growing behind the residence, and one of the vehicles parked there belonged to Grice.[17]

The entry team arrived at the residence at 9:30 p.m. and surrounded the house along with

the recon team.[18]  With a marked sheriff's vehicle's headlights behind him, Deputy Sharp

knocked on the door, and announced that he was looking for Grice and had arrest warrants.[19]

Sharp testified that he spoke loudly enough for anybody inside the small residence to hear him.[20]

Officer Richard also directed Grice to come out, using his vehicle's "PA" system.[21]

Approximately eight minutes later, Grice opened the door. Through the door, Deputy Sharp saw

a person kneeling in the corner, who later turned out to be Grice's wife.[22]  Sharp drew his weapon

and Grice froze.[23]   Sharp then grabbed Grice's wrist, pulled him out of the residence, and told

him to get on the ground.[24]  Pursuant to Deputy Sharp's order, Deputy Jerol Morrow placed Grice

on the ground and handcuffed him.[25]

---

[16] Id.

[17] Id.

[18] Tr. 35, 36.

[19] Tr. 36.

[20] Tr. 37.

[21] Sharp Narrative, C-1, at p. 123.

[22] Tr. 39, 66.

[23] Tr. 41.

[24] Sharp Narrative, C-1, at 123.

[25] Id.

Sharp entered the residence with the 4-man entry team to make a protective sweep.  Sharp testified that team was in the cabin for less than ten seconds, looking for other individuals, particularly anyone with weapons who could hurt his team or others outside.[26]  Based upon his training and experience, Sharp concluded that dangerous chemicals were probably in the cabin, so he ordered everyone out.  He asked Grice about the lab in the house.  Grice responded that everything inside the house was his and not his wife's.  Sharp testified that Grice "told me to be careful if you go back in there because stuff in there would blow is his exact quote."[27]  Sharp locked the cabin and left another deputy to secure it.

Sharp met with Grice the next morning in Deputy McCullough's office at the Beauregard Parish Sheriff's Office.   Sharp advised Grice of his *Miranda* rights again and read to him the consent to search form. Grice appeared to understand his rights, was coherent, did not appear to be under the influence of alcohol or drugs, responded appropriately to questions, and was not threatened or induced by any promise to waive his rights or consent to a search.[28]  Sharp read the consent form to Grice and asked Grice to read the waiver part at the bottom.  Grice said he had trouble reading; however Grice read it and stated he understood it.  Grice signed the waiver and consent form.[29]  Sharp specifically denied promising Grice that he could see his wife in exchange for his consent.[30]

---

[26] Tr. 44.

[27] Tr. 47.

[28] Tr. 48-52.

[29] Tr. 76, 51-52.

[30] Rec. Doc. 74.

**Jerol Morrow**, a Merryville patrol officer, testified as follows: He provided transport and support for the operation.[31]  He is a member of the Bravo SWAT team which was not called out that night for the SWAT operation but was on its regular patrol.  Morrow, with the help of Deputy Crow,  handcuffed Grice after Grice emerged from the cabin.[32]  They were positioned approximately 5-10 feet from the cabin door.[33]  After Grice was handcuffed, Morrow took him back another 5-10 feet and had him sit on the ground next to Richard's patrol car.[34] According to Morrow, it took between one and two minutes to cuff Grice, move him, "pat him down," search his boots and secure him.[35] Morrow testified that his attention was focused on Grice himself, not Mrs. Grice, but that by the time he had finished securing Grice, an officer had brought Mrs. Grice out, the house had been cleared and the rest of the entry team had come out.[36]  Morrow testified that the SWAT team was in the house for "less than a minute."[37]

[31] Tr. 93.

[32] Tr. 96, 103-105.

[33] Tr. 103.

[34] Tr. 105.

[35] Tr. 108.

[36] Tr. 112-113.

[37] Tr. 102.

Morrow transported Mr. and Mrs. Grice to the Beauregard Parish Sheriff's Office. He *Mirandized* Grice, who refused to waive his rights.[38]  Grice did not ask for an attorney.[39]  Morrow placed the form in Deputy McCullough's box, booked him into the jail, and took him back into the jail.[40]  At that time the jail personnel took over.

**<u>Robert McCullough</u>,** Chief Deputy with the Beauregard Parish Sheriff's Office, testified as follows:  according to the booking records, Grice was placed in a holding cell, given a mattress, sheet, blanket, laundry bag, and shower shoes.  He was given breakfast and juice at 5:51 a.m. on March 21 and was removed from the cell around 7:37 a.m. for the completion of his booking.[41]  Grice was then brought up to Deputy McCullough's office, and he and Deputy Sharp spoke to Grice between 9:00 and 10:00 that morning in order to obtain his consent to search the cabin.[42]

Prior to questioning Grice, Deputy Sharp read the *Miranda* warnings to him.  Grice stated he understood that he was waiving his *Miranda* rights, including his right to an attorney.  Grice understood that he was consenting to a search of the cabin and that he could refuse.  The officers made no threats or promises to Grice in order to obtain the consent.[43]  Sharp read aloud the top

---

[38] Exh. 5.  The rights form indicates that Grice was *Mirandized* at the BPSO at 11:00 p.m.  on March 20, 2007.  Ex. 5.  Morrow initially testified that he *Mirandized* en route to the jail, and later testified that he *Mirandized* Grice when he booked him in at 12:40 a.m. on March 21.  (Tr. 94, 98, 113).  Neither party has raised an issue as to whether Grice was *Mirandized* at 11:00 p.m.  on March 20 or at 12:40 a.m.  on March 21, or both.  In either event, it is established that Grice was read his *Miranda* warnings prior to being questioned.

[39] Tr. 95, 113.

[40] Tr. 115.

[41] Tr. 130.

[42] Tr. 122-123.

[43] Tr. 123-28, 139-141.

portion of the form which contained the advice of rights, and Grice then read the waiver form at the bottom out loud.[44]  Grice told the officers that he could read better with his glasses, but he nevertheless read the waiver of rights on the *Miranda* form to Deputy Sharp and himself.  Sharp read the consent-to-search form to Grice, and Grice signed it in front of Deputy McCullough.[45]  Grice never asserted any of his rights nor did he request a lawyer in McCullough's presence.[46]  McCullough was not aware that Grice had refused to waive his rights the night before, when they were read by Officer Morrow.

McCullough testified that the officers made no threats or promises to get him to sign the consent or the waiver and that it was apparent that Grice understood that he was consenting to a search of the cabin.[47]  Grice remained in the office for a "couple minutes," but, before he left, he cautioned Sharp to be careful in the cabin due to "the chemicals and the ether, and that he had made methamphetamines using that lab but had not used it recently.[48]

**Hugh Sebron Grice**, the defendant, testified as follows: At the time of the events in question, he was a fugitive living with his wife in a small house owned by other family members, without their knowledge.  The house was small, about 860 square feet, with two bedrooms, one bath, a living room and a kitchen.  He woke up at 4:30 a.m. on March 20.  When Deputy Sharp knocked on his door at 9:30 that night, he did not immediately go to the door because he was in

---

[44] Tr. 123-124, Exhibit 6.

[45] Tr. 126.

[46] Tr. 124.

[47] Tr. 127.

[48] Tr. 127-128.

bed and needed to get his dogs under control. After he answered the door, he stopped on the front porch because guns were pointed at his head, and he was then thrown to the ground.

Grice testified that after he exited the cabin, an officer, whom he believed to be Deputy Sharp, began describing some things he knew "for a fact was in the cabinets, under cabinets, and in boxes" and he "knew for a fact that he had searched the house . . . ."[49] . He told Sharp, . . . look, if you are going to have officers in there digging around there is things that will blow."[50] He explained this statement to Sharp meant there were "deals to fish with . . . and other things that could possibly explode if they were knocked off."[51] Grice also testified that there were no weapons in plain view, and the officers would have had to do more than simply walk through in order to discover them.[52] Grice testified that the officers were in his cabin for about 15 minutes.[53]

According to Grice, when he arrived at the Sheriff's office and began the booking process, he refused to waive his rights and he asked for an attorney; he was not issued a pillow, mattress or blanket when he was in the holding cell. He didn't remember eating or sleeping, and had been up for 29½ hours when he went to Deputy McCullough's office. He was distraught when he signed the consent. His consent to search was also influenced by a telephone conversation which he overheard between Sgt. Laviolet of the ATF and Deputy Sharp that led him to believe the residence had already been searched.[54] Grice testified that Sharp promised to

---

[49] Id.

[50] Id.

[51] Tr. 155.

[52] Tr. 156.

[53] Tr. 152.

[54] Tr. 164-165.

allow him to smoke a cigarette with his wife if he signed the waiver of rights and that his consent to search was simply to allow the officers to clean the mess up in the cabin.[55]

**Ray Laviolet** testified that had been assigned by the Lake Charles City Police to the ATF task force since 2002, and his specialty with the ATF is firearms.[56]  Officer Laviolet was "called into the case" around 8:00 or 9:00 a.m. on March 21, 2007, by a Beauregard officer, the name of whom he did not recall, requesting his presence at the cabin at the search being because there was "a meth lab there and there was illegal weapons and also IED."[57]  The possible explosives were "IED's," improvised explosive devices.[58]

**Craig Richard**, an officer with the DeRidder City Police Department, testified as follows: He is currently assigned to the Beauregard-DeRidder Narcotics Task Force.  He helped plan the SWAT operation and was present when Grice was arrested.  He did not enter the cabin but stayed at the front door during the arrest.  Certain officers went in the cabin and brought out Mrs. Grice; some of them then started saying that their eyes were burning.  Either Deputy Sharp or another detective stated there were "some kind of chemicals" in the cabin, and gave the order, "let's get out" and the officers started coming out of the house.[59]  Richard corroborated Sharp's testimony that the officers were in the house for only 10-15 seconds, stating "It wasn't no ten minutes or – it was definitely not even probably a minute.  It was very short, 10 to 15 seconds."[60]

---

[55] Tr. 163-164.

[56] Tr. 188-189.

[57] Tr. 190.

[58] Tr. 193.

[59] Tr. 199-200.

[60] Tr. 200.

*Analysis*

Grice does not challenge the legality of his arrest, only the warrantless search of his residence. Grice contends the entry into his house after his arrest was pre-textual and, if the officers believed that they had probable cause to search the cabin, they should have gotten a search warrant prior to their entry. Grice also contends that his consent to search was involuntary.

Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment subject only to a few specific exceptions. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 514 (1967). The government has the burden to show, by a preponderance of the evidence, that a warrantless search falls within one of the exceptions. Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969, 1972 (1970); United States v. Chavis, 48 F.3d 871 (5ᵗʰ Cir. 1995). Exceptions to the warrant requirement include "investigatory detentions, searches incident to a valid arrest, seizure of items in plain view, exigent circumstances, consent searches, vehicle searches, container searches, and searches in which the special needs of law enforcement make the probable cause requirement impracticable." U.S. v. Cota-Lopez, 358 F.Supp.2d 579, 590 (W.D.Tex. 2002). Another exception is the inevitable discovery rule. U.S. v. Lamas, 930 F.2d 1099, 1102 (5th Cir.1991); U.S. v. Cherry, 759 F.2d 1196, 1205-06 (5th Cir.1985).

Here, the government contends that the initial entry into Grice's cabin was justified as a protective sweep incident to an arrest, and/or on grounds of exigent circumstances. The government also cites the inevitable discovery rule, and Grice's consent to the search.

## I.    *Constitutionality of the Initial Entry of March 20, 2007*

### A.    *Protective Sweep and/or Exigent Circumstances*

#### 1. *Protective Sweep*

The constitutional scope of a protective sweep incident to an arrest was addressed in Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093 (U.S.1990). In that case, the Supreme Court established a two-prong test: first, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334. Second, a broader sweep is permitted "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 337. In either circumstance, a protective sweep "is not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger . . . " Id. at 335-36.

"Buie authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; Buie does not allow a protective sweep for weapons or contraband." U. S. v. Waldner, 425 F.3d 514 (8th Cir.2005) (citations omitted).

The Fifth Circuit, in an *en banc* opinion interpreting Buie, held that an arrest is not an indispensable element of an in-home protective sweep, and, although arrest may be highly relevant, potential for danger to officers may also be established by other circumstances. U.S. v. Gould, 364 F.3d 578, 586 (5th Cir. 2004). In Gould, the Fifth Circuit articulated other requirements for a valid in-home protective sweep:

1)   Although the protective sweep may extend to areas of the home where the police otherwise (apart from the protective sweep doctrine) have no right to go, nevertheless, when undertaken, the police may not have entered (or remained in) the home illegally and their presence must be for a legitimate law enforcement purpose.

2)   The protective sweep must be supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene.

3)   The sweep may not be a full search but may be no more than a cursory inspection of spaces where a person may be found.

4)   The sweep is limited to two time-limitations: first, it must be necessary to dispel the reasonable suspicion of danger, and second, it may last no longer than the police are justified in remaining on the premises, i.e. police are permitted to take reasonable steps to ensure their safety after, and while making the arrest.

Gould, 364 F.3d at 587.

It is undisputed that the officers arrested Grice pursuant to outstanding arrest warrants for failure to appear. As discussed above, the warrants related to charges of second-degree battery and drug trafficking. Officers also knew from their investigation that Grice possibly had weapons, bomb-making items, and Klan ties. They had observed the exterior of the residence, the tank, the melted mini-blinds, and cameras. Based on all of this information, Deputy Sharp "felt that it was probably one of the most dangerous warrants, arrest warrants, that [he] had went [*sic*] on and had put his team in . . .."[61] In fact, a Louisiana State Police bomb expert was on call to assist with the operation due to the information that officers had acquired.[62] Moreover, it is undisputed that when Grice opened his front door, Deputy Sharp could see Mrs. Grice inside the

---

[61] Tr. 61-62.

[62] Sharp Narrative, C-1, at 122.

cabin.[63]  Under this set of facts, I conclude that the officers' entry into Grice's cabin constituted a protective sweep incident to an arrest, a lawful exception to the warrant requirement.  There is no dispute that officers saw Mrs. Grice inside the cabin.  It was reasonable for the officers to believe the cabin might harbor others who might pose a danger to the officers on the scene, and likely harbored other dangers, including the possibility of bombs and dangerous chemicals.

As to the scope of the sweep, there is a material factual dispute.  Grice testified that the officers were in his cabin for about 15 minutes and engaged in a full search, not a protective sweep.  Grice testified:

> A.  They all rushed in at the same time and they were in there banging and searching around for about 15 minutes, and then a couple of them emerged with my wife Paula in handcuffs, and I told them she didn't have anything to do with it, the bench warrant was for my arrest for my failure to appear in court.  And then one of them come squat down next to me who I believe was Dale Sharp and started describing some things that was in the house that I know for a fact was in the  cabinets, under cabinets, and in boxes. And I knew for a fact that he had searched around in that house, and I told him, look, if you are going to have officers in there digging around there is things that will blow.[64]

Deputy Sharp and other officers testified that they were inside the cabin for only seconds; that the cabin was considered a dangerous environment, and that the search was limited to a protective sweep incident to Grice's arrest.  Sharp described as follows:

> A.  [DEPUTY SHARP].  Yes, ma'am.  To answer your question, when I went in, I was entry team leader, point man, first guy.  James Howard was right behind me.  We ordered Ms. Grice on the ground.  She complied.  We continued the sweep of the house.  My other two officers who was Josh Stanford and Buddy Maddox escorted her on outside.  Then Detective

---

[63] Tr. 39.

[64] Tr. 152-153.

Howard, who is on the task force with me, cleared the residence -- found the chemicals and the lab, and we exited out of the residence.

Q.    [MS. KARRE-GAUTREAUX]   When you exited, that is when you saw Ms. Grice being read her rights?

A.    No, ma'am.  I had to tell everybody what we had and move everybody away from this house.  It was very dangerous.  And when I walked up – it was around 2152.  I walked up and Deputy Morrow was advising both Mr. Grice and Ms. Grice, Paula Grice, of their rights.

Q.    And how long were you out of the house before you saw Ms. Grice?

A.    Ma'am, I was probably out several minutes because I had a lot of people at that residence and I needed everybody to move back, so it was several minutes by the time I made entry into the house.  It didn't take me very long.  The house was small.  It was very dangerous with what we found.

* * *

Q.    According to your report, you entered the house at 2138?

A.    Yes, ma'am.

Q.    And you saw Ms. Grice -- you saw Lieutenant Morrow advising her of her rights at 2152?

A.    Yes, ma'am.

Q.    That's 14 minutes.

A.    Yes, ma'am.  I had a lot of men at that residence.  I had to go completely around the house.

Q.    The house itself was only about 800 square feet; is that correct?

A.    Yes, ma'am.

Q.    What happened during that 14 minutes?

A.    I was advising all my people, two different teams, that we had a methamphetamine lab inside the house, it was probably chemicals around the house, and that everybody needed to back away -- everybody needed to back away from the house.

Q.     What did you find in the house?  What did you see when you went in?

A.     Ma'am, I didn't see a whole lot of anything.  I started smelling chemicals, but when I opened the bathroom door, I could see beakers, clear liquids, dark liquids.  I glanced in it with -- our weapons have lights, we don't turn any kind of light switches on.  When I realized that – actually my partner said meth lab, and I said everybody out of the home.  We had two more rooms right before that very small and packed with stuff.  We glanced through it.  No one was in there, no weapons, no people with weapons, and we moved right out of the house.[65]

Without exception, all of the officers who testified in the case were credible witnesses, and their testimony was consistent on all material points.  Furthermore, other than the dispute regarding the scope of the search, defendant's testimony corroborated that of the government witnesses on a number of material points.  Grice admitted that he was a fugitive, that there were dangerous chemicals in the cabin, that he warned officers to be careful because "there's things that could blow;" that inside the house were two bottles of isopropyl alcohol, a jug with "a gallon-and-a-half of ether," and a quantity of anhydrous ammonia.[66]

On the contested issue of the time officers spent in his house immediately after his arrest, I found that Grice was either exaggerating, or he over-estimated the passage of time due to the dramatic nature of the arrest and number of officers involved.  It is uncontested that the cabin housed explosive chemicals.  I conclude that the officers' primary interest was the safety of the team and others in the area, and that the search of the house immediately after Grice's arrest was a protective sweep which did not exceed a proper scope given the circumstances.  Accordingly,

---

[65] Tr. 67-69.

[66] Tr. 155, 156, 176.

the undersigned concludes that the government has carried its burden of showing that the

warrantless search was justified under the protective sweep doctrine and was proper in scope.

### 2. Exigent Circumstances

As to the exigent circumstances doctrine, the Fifth Circuit has held there is no set formula

for determining when exigent circumstances may justify a warrantless entry; however, it has held

in the past that the possibility that evidence will be removed or destroyed, the pursuit of a

suspect, and immediate safety risks to officers and others are exigent circumstances that may

excuse an otherwise unconstitutional intrusion into a residence. U.S. v. Newman, 472 F.3d 233,

237 -238 (5th Cir. 2006). The Fifth Circuit has created a non-exhaustive five-factor list to

determine whether exigent circumstances exist:

> (1) the degree of urgency involved and the amount of time necessary to obtain a
> warrant; (2) the reasonable belief that contraband is about to be removed; (3) the
> possibility of danger to the police officers guarding the site of contraband while a
> search warrant is sought; (4) the information indicating that the possessors of the
> contraband are aware that the police are on their trail; and (5) the ready
> destructibility of the contraband and the knowledge that efforts to dispose of it and
> to escape are characteristics in which those trafficking in contraband generally
> engage.

U.S. v. Mata, 517 F.3d 279, 287 (5th Cir. 2008).

This case involves officer safety. Exigent circumstances exist if the officers' fear for their

safety was reasonable. Newman, 472 F.3d at 237. As noted above, the officers had reasonable

cause to fear for their safety inasmuch as the officers were aware that another person was in the

cabin, had knowledge that Grice possibly had weapons and bomb-making material, and based on

observations that the cabin could contain a methamphetamine lab.

In order to enter a person's residence, even under exigent circumstances, law enforcement

first must have probable cause to believe that contraband is inside or that an illegal act is taking

place.  Newman, 472 F.3d at 236.  Here, it is clear that the officers had probable cause to believe there was contraband inside the cabin.  Their investigation had shown that Grice was a fugitive, was likely armed, was probably operating a meth lab, and was possibly engaged in bomb-making.  Observation of surveillance cameras and tanks outside the cabin, and the melted-mini blind, reinforced the officers suspicions that illegal activity was taking place within the cabin.  Having concluded that there was probable cause to search the cabin, and given the exigent circumstances, the search was justified.

### B.      Search Incident to a Lawful Arrest

A person validly arrested may be searched without a warrant.  A search is "incident to" an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.  Shipley v. California, 395 U.S. 818, 819 (1969); Von Cleef v. New Jersey, 395 U.S. 814 (1969).  Under this rule, it is permissible for police to search the "arrestee's person and the area 'within his immediate control,'" to wit:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.  Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated.  In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.  *And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule.  A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested.  There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'--construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.*

Chimel v. California, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 2040 (1969).  A search incident to arrest may be made regardless of probable cause or reasonable suspicion.  U.S. v. Virgil, 444 F.3d 447, 452 (5th Cir. 2006).

Grice argues in his motion to suppress that by the time the officers entered his home, he was already out on the lawn in handcuffs so that the officers had no authority to search since he presumably posed no hazard to the arresting officers or any evidence.  The government has not cited nor have I found a Fifth Circuit case directly on the issue.  However, in U.S. v. Abdul-Saboor, 85 F.3d 664, 666 (D.C. Cir.1996), the D.C. Circuit addressed this issue and rejected such an argument.

In that case, officers had gone to defendant's home to execute a bench warrant. The defendant answered the door in his bathrobe and asked for permission to go to his bedroom and dress.  The officers agreed.  While in the bedroom, the defendant armed himself with a pistol which Deputy Parker observed and ordered him to drop.  Deputy Skillman handcuffed defendant and removed him to a chair about four feet away from the bedroom door then left the area to call for assistance.  Deputy Parker guarded defendant while Skillman was gone.  When Skillman returned, Deputy Parker searched the bedroom, finding crack cocaine on a television set, a gun under a mattress, and another gun protruding from a closet.  The appellate court affirmed the district court's denial of defendant's motion to suppress.  The court found that the determination of immediate control is to be made when the arrest occurs, and that a search is conducted incident to arrest as long as it is an integral part of a lawful custodial arrest process.  Id. at 668. The court concluded that the relevant distinction turned not upon the moment of arrest versus the moment of the search, but upon whether the arrest and search are so separated in time or by

intervening events that the latter cannot fairly be said to have been incident to the former. The court concluded that such a rule was sensible in that, if courts were to focus exclusively upon the moment of the search, courts might create a "perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer. That danger is not necessarily terminated by the arrest." Id. at 669.

I find the reasoning of Abdul-Saboor to be persuasive. Here, the execution of the bench warrants was hardly routine but involved a potentially highly volatile situation for which Swat teams had been dispatched and for which a bomb tech was on call. Here, the search was conducted practically simultaneously with Grice's arrest. It was entirely possible that evidence in the cabin was being destroyed or that Mrs. Grice could have acted violently, in that explosives or chemicals could have discharged. I find that the officers were entitled to conduct their cursory search of the small cabin incidental to Grice's arrest.[67]

### C. *Inevitable Discovery*

The government also argues that if the search is deemed improper, evidence should be admitted under the inevitable discovery rule.[68] In order for the inevitable discovery doctrine to allow the use of otherwise illegally obtained evidence, the Government must prove by a preponderance of the evidence that (1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of the police misconduct and (2) the Government was actively pursuing a "substantial alternate line of investigation at the time of the

---

[67] Moreover, Sharp testified that Mrs. Grice was arrested on marijuana cultivation charges inside the home. I further find that the officers were entitled to make their brief search the small cabin for the purpose of securing it incidental to Mrs. Grice's arrest.

[68] Tr. 203.

constitutional violation." <u>U.S. v. Lamas</u>, 930 at 1102; <u>U.S. v. Cherry</u>, 759 at 1205-06. Inevitable discovery cannot rest upon speculation, but rather must be supported by historical facts that can be verified or impeached. <u>Lamas</u>, <u>Id.</u>

Presumably, the government's position is that the seized evidence would have been discovered through an independent investigation by the United States Marshals Service. However, as I have found that there was no police misconduct in conducting the search, it is unnecessary to reach this issue.

## II. *Voluntariness of Consent*

Grice also moves to suppress the seized evidence because his consent to search the cabin was not voluntary. Grice contends his consent to search the residence was not voluntary because he had trouble reading the consent form without his glasses; he had not slept for many hours; he had not been fed; and he was distraught about his arrest, and worried about his wife. He also testified he was influenced by a telephone conversation he overheard that led him to believe the residence had already been searched. Finally, Grice asserts that his consent was vitiated by officers' promise to allow him to smoke a cigarette with his wife if the consent was given.

The government contends that, since the officers' search of the cabin on March 20th was lawful, then it is unnecessary to reach the issue whether defendant's March 21st consent was voluntary because they had the authority to seize the items they had observed in plain view. The government cites <u>U.S. v. Maldonado</u>, 472 F.3d 388, 392 (5th Cir.2006). Maldonado is inapposite because the seizure was contemporaneous with the sweep. The government relies on exceptions to the search warrant requirement that are limited in scope and time and in order to protect the officers' safety. The officers had authority to seize the items in plain view during their cursory

sweep of the cabin which was incident to Grice's arrest.  However, once the officers secured the cabin and left, there were no longer any exigent circumstances.  Accordingly, I find that it is necessary to consider whether Grice's consent was voluntary.

A consensual search is another well-established exception to the Fourth Amendment's warrant requirement.  U.S. v. Mata, 517 F.3d 279, 290 (5th Cir. 2008). (citation omitted).  Only free and voluntary consent justifies a warrantless search.  Id. (citation omitted).   The government must first demonstrate that consent to search was given and the next issue is whether it was voluntary.  U.S. v. Freeman, 482 F.3d 829, 832 (5th Cir. 2007).   Voluntariness is to be determined based on the totality of the circumstances, with the burden of proof on the government.  Id.   The Fifth Circuit has noted:

> Voluntariness is determined by the totality of circumstances, which a court evaluates by considering six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

Mata, 517 F.3d at 290 (citation omitted).

With respect to Grice's contention regarding the conditions of his detention prior to his waiver, photographs show that the holding cell in question included a sink, shower, and toilet.  It is undisputed that water was available in the cell.  Grice claims that he was not fed, and there is a dispute whether Grice received a mattress.  In any event, there is nothing in the record to suggest that any fatigue or hunger Grice experienced was so severe as to vitiate his consent.

Further, I find the officers' testimony credible that Grice could read without glasses although his vision is blurry.  I further find that Grice is literate and was able to read the form.  Moreover, the officers read and explained the form to him.  The record shows that Grice is

intelligent and understood what he signed. Certainly, the fact that Grice may have been induced

by a promise to have a cigarette with his wife is insufficient to suggest improper coercion. *See*

*e.g.* U.S. v. Glover, 104 F.3d 1570, 1584 (10th Cir. 1997) (consent to search home voluntary

though government agents promised to make deal with defendants if they promised to consent).

Additionally, Grice had made admissions during the night of the arrest when he told the

Sharp to be careful if re-entered the cabin "because stuff in there could blow" which support a

finding that there was no indication that Grice believed no incriminating evidence would be

found.[69]      There is no evidence of coercion by the officers, or any impairment of Grice's

faculties which would render his consent involuntary.  Accordingly, considering the totality of

the circumstances, I find that Grice's consent to search the cabin was made voluntarily.

### *Conclusion*

For the foregoing reasons, **IT IS RECOMMENDED** that defendant's motion to suppress

be **DENIED.**

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have

ten (10) days from receipt of this Report and Recommendation to file specific, written objections

with the Clerk of Court.  Counsel are directed to furnish a courtesy copy of any objections or

responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the**

**proposed legal conclusions reflected in this report and recommendation within ten (10)**

**days from the date of its service, or within the time frame authorized by Fed.R.Civ. P. 6(b),**

**shall bar an aggrieved party from attacking the factual findings or the legal conclusions**

---

[69] Tr. 47.

accepted by the district court, except upon grounds of plain error.  See **Douglass v. United Services Automobile Association**, **79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on July 22, 2008.


Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)